UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

JOSE L. VELESACA and ABRAHAM CARLO
UZATEGUI NAVARRO, on his own behalf and
behalf of others similarly situated,

                      Petitioners-Plaintiffs,

      -against-

THOMAS R. DECKER, in his official capacity as
New York Field Office Director for U.S.
Immigration and Customs Enforcement;
MATTHEW ALBENCE, in his official capacity as
the Acting Director for U.S. Immigration and
Customs Enforcement; UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; CHAD WOLF, in his official
capacity as Acting Secretary of the U.S. Department
of Homeland Security; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY;
CARL E. DUBOIS, in his official capacity as the
Sheriff of Orange County,

                     Respondents-Defendants.

------------------------------------------------------------ X

**OPINION & ORDER GRANTING
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

20 Civ. 1803 (AKH)

**ALVIN K. HELLERSTEIN, U.S.D.J.:**

       Plaintiffs allege that, since the middle of 2017, the New York Field Office of the

United States Immigration and Customs Enforcement ("ICE"), has adopted and implemented an

unannounced policy (the "No-Release Policy") of detaining without bond virtually every alien it

arrests, even when an arrestee is neither a flight risk nor a danger to the community.[1]  Plaintiffs

bring this action on behalf of a putative class of persons "eligible to be considered for bond or

---

[1] The named Defendants include the United States Department of Homeland Security ("DHS"), the federal agency
responsible for arresting, detaining, and prosecuting persons suspected of civil immigration violations; Chad Wolf,
the acting Secretary of DHS; ICE, a subcomponent of DHS; Matthew Albence, the acting Director of ICE; Thomas
R. Decker, the director of ICE's New York Field Office; and Carl Dubois, the Sheriff of Orange County, and the
individual charged with oversight of the Orange County Correctional Facility, which houses named petitioners
Velesaca and Uzategui.

release on recognizance under 8 U.S.C. § 1226(a)(1)-(2) by ICE's New York Field Office who have been or will be detained without bond."[2]  Stated generally, Plaintiffs contend that the "No-Release Policy" precludes ICE officers from conducting individualized custody determinations, and therefore violates the Immigration and Nationality Act ("INA") and regulations implemented thereunder, the Due Process Clause of the Constitution, the Administrative Procedure Act, and the Rehabilitation Act.  Defendants, for their part, principally deny that the No-Release Policy, such as it is described by Plaintiffs, exists.

Now before the Court is Plaintiffs' motion for a preliminary injunction, seeking, *inter alia*, that the Court set aside the No-Release Policy and return ICE to its prior practice of conducting individualized custody determinations.  Given the nature of the allegations, and the danger to detainees posed by the COVID-19 pandemic, this motion was briefed and heard on an expedited timeline.  The operative Complaint was filed on March 16, 2020 and Plaintiffs' motion for a preliminary injunction was filed that same day.  Defendants filed their opposition brief on March 24, and Plaintiffs filed a reply on March 26.  On March 31, oral argument was held on the motion telephonically, at which time I extemporaneously delivered my ruling granting Plaintiffs' motion for injunctive relief.  What follows is a formal opinion explaining more fully the Court's reasoning for its oral ruling granting Plaintiffs' motion.

### Background

In this section, I summarize the core allegations made in the Complaint, the evidentiary supplements added by Plaintiffs in their motion for a preliminary injunction papers, the key facts alleged in Defendants' opposition papers, and the case's procedural history.

---

[2] As discussed *infra*, Plaintiffs also seek relief on behalf of a subclass of detained aliens with disabilities.  Plaintiffs have filed a motion for class certification, but this motion, filed on February 28, 2020, has not yet been briefed.

A. <u>The Complaint</u>

    *1. The No-Release Policy*

        The Complaint alleges that, since in or around the middle of 2017, federal immigration officials in New York City "adopt[ed] what is in effect a blanket policy of denying release and bond across the board" to individuals arrested by ICE authorities.  Comp., ECF No. 31, at ¶ 1.  Plaintiffs refer to this policy as the "No-Release Policy."  *See id.*

        According to Plaintiffs, Defendants' adoption of the No-Release Policy roughly coincided with other significant changes to ICE's custody-determination protocol.  In 2013, for example, ICE began to use a "risk-assessment tool" to assist its officers in making initial custody determinations.  *Id.* at ¶ 18.  As initially configured, the tool could recommend any one of four outcomes: (1) release on recognizance; (2) release on bond; (3) defer the custody decision to an ICE supervisor; or (4) detain without bond.  *See id.*  In 2015, the Complaint goes on, ICE started to "alter its custody determinations process …, modifying [the tool] so that it could no longer recommend individuals be given the opportunity for release on bond."  *Id.* at ¶ 20.  In mid-2017, ICE "removed the tool's ability to recommend release on recognizance," leaving the tool able to make "only [] one substantive recommendation," namely, "detention without bond."  *Id.*

        Around the same time ICE made its alleged 2017 modifications to the risk-assessment tool, the Complaint claims that ICE's New York Field Office "doubled down on detention and implemented a blanket policy of denying bond or release without an individualized determination of whether detention was necessary based on flight or safety risks."  *Id.* at ¶ 21.  The Complaint urges that the fact of the adoption of the Policy is evident in a simple before-and-after comparison of detentions:  In 2013 and 2014, nearly half of all aliens arrested by ICE officials in New York City and deemed by the risk-assessment tool to be of little risk of flight or

of endangering the community were released on bond or recognizance; between mid-2017 and September 2019, around 2% of these low-risk individuals were so released.  *See id*. at ¶ 23.

The effects of the No-Release Policy have, according to the Complaint, been exacerbated by two other contextual developments:  First, President Trump's Administration's shift toward "arresting people with no criminal history and who have resided in the United States for years," *id*. at ¶ 24; and second, the fact that the Trump Administration has "vastly expanded its enforcement actions," *id*. at ¶ 25.  Due to the "convergence of these three separate, but related, policy changes, the New York Field Office is now arresting record levels of people and ordering them detained without bond, even though an increasing number of them present no danger to the community or risk of flight."  *Id*. at ¶ 26.

*2. The Effects of the No-Release Policy*

Those denied release, Plaintiffs continue, must "remain unnecessarily incarcerated in local jails for weeks or even months before they have a meaningful opportunity to seek release in a hearing before an Immigration Judge," or "IJ."  *Id*. at ¶ 3.  For many of these detainees, their initial IJ appearance "does not provide a meaningful opportunity to seek bond," as many cannot afford attorneys or meet with a City-sponsored attorney prior to their first hearings, limiting the ability to prepare a bond application until later on.  *See id*. at ¶¶ 29-36.  Plaintiffs further allege that once a substantive IJ hearing on bond is held, "approximately 40% of people detained by ICE are granted release on bond," presumably indicating that many who should be eligible for release on bond are denied initial release.  *Id*. at ¶ 3.

The Complaint notes that during the time between detention and the first appearance before an IJ, detainees are separated from their families, friends, communities, and risk losing their children, jobs, and homes.  *See id*.  This imposes a variety of harms: (1) the

intrinsic harm of separating families, *id.* at ¶ 38; (2) the threat to those who need medical care, whether physical or mental, but receive inadequate treatment in ICE facilities and/or have one or many preexisting symptoms worsened by detention, *id.* at ¶¶ 39-45; (3) the limits detention tends to place on the ability to prepare a bond application, *e.g.*, detention may worsen mental health symptoms that hamper recollection of the traumatic events necessary to presenting an application for bond or withholding of removal, *id.* at ¶¶ 46-47; and (4) the economic harm to families that are deprived of a primary earner, *id.* at ¶ 48.

    *3. The Named Plaintiffs*

    Named Plaintiffs Jose Velesaca and Abraham Uzategui were arrested by ICE, denied release pursuant to 8 U.S.C. § 1226(a) by ICE's New York Field Office, and are currently detained without bond. *See id.* at ¶¶ 6-7.  As to them, the Complaint alleges the following.

    Uzategui, a native of Peru, lives in New York with his wife and daughters.  *See id.* at ¶ 49.  He was arrested by ICE on February 18, 2020 and ordered detained without bond; he appeared before an IJ on March 3, 2020, and was given until April 9, 2020, to consult with an attorney to prepare a bond application.  *See id.* at ¶ 50.  Uzategui injured his neck, shoulder, and arm, while working as a delivery person in 2018 but, Plaintiffs allege, he has not received the physical therapy and pain medication he needs in ICE detention.  *See id.* at ¶¶ 51-52.

    Velesaca, a native of Ecuador, lives in New York with his family.  *See id.* at ¶ 55.  He was arrested by ICE on January 30, 2020 and ordered detained without bond; he appeared before an IJ on February 24, 2020, was given until March 2, 2020 (later adjourned to March 4) to consult with his attorney to prepare a bond application, and on March 4, 2020, the IJ denied his request for bond.  *See id.* at ¶ 56.  He has another hearing scheduled for March 23, 2020.  *See id.* Velesaca suffers from Posttraumatic Stress Disorder and Major Depressive Disorder—symptoms

include: nervousness, trouble sleeping, and anxiety—from a physical assault he experienced in

2016, which harm has been worsened by his time in detention. *See id*. at ¶¶ 58-60.

### 4. The Proposed Class and Requested Injunctive Relief

As indicated *supra*, Plaintiffs bring this suit on behalf of a class and subclass of

detainees. Specifically, the Complaint defines the proposed "Petitioner Class" as follows:

> All individuals eligible to be considered for bond or release on recognizance
> under 8 U.S.C. § 1226(a)(1)-(2) by ICE's New York Field Office who have been
> or will be detained without bond.

*Id*. at ¶ 66. The Complaint defines a proposed "Rehabilitation Act Subclass" as follows:

> All individuals with a disability, as defined by the Rehabilitation Act and its
> implementing regulations, who are eligible to be considered for bond or release
> on recognizance under 8 U.S.C. § 1226(a)(1)-(2) by ICE's New York Field Office
> and who have been or will be detained without bond.

*Id*. at ¶ 67.[3] As to relief, Plaintiffs seek, among other things, an order requiring Defendants "to

conduct an individualized custody determination for Jose Velesaca, Abraham Uzategui, and each

member of the proposed class." *Id*. at 22.

### B. Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs' moving papers in support of their request for a preliminary injunction

largely restate, albeit in more detail, the allegations in the Complaint. However, Plaintiffs draw

the Court's attention to several supplementary submissions——primarily, expert declarations on

the risk of COVID-19 and the existence of the No-Release Policy——that warrant some discrete

attention and summarization.

---

[3] As noted above, *see supra* note 2, Neither the class nor subclass has, as of yet, been certified, and Plaintiffs' motion
for certification, *see* ECF Nos. 9, 10, 32, 33, remains pending.

*1. COVID-19*

First, in connection with their preliminary injunction motion, Plaintiffs cite several expert declarations tending to support the position that the COVID-19 pandemic, poses particular danger for the putative class and subclass in light of ICE's subpar healthcare abilities. For instance, Plaintiffs reference a sworn statement from Marinda van Dalen, a Senior Attorney in the Health Justice Program at New York Lawyers for the Public Interest ("NYLPI").  *See* Val Dalen Decl., ECF No. 43.  In her declaration, Van Dalen comments generally on the purported shortcomings in ICE's ability to provide quality care to detainees:

> Once in detention, people face many barriers to quality healthcare, including lack of information on how to request medical assistance, institutional refusal of services, misdiagnosis, diagnosis of a less serious condition, lax oversight of their condition and/or treatment, failure to provide mental health discharge planning, and language access barriers.  Confinement in immigration detention takes away a person's own ability to address their illness——something many people we interviewed had been doing successfully for years before detention. ….
>
> NYLPI has documented significant and systemic problems regarding the conditions of confinement at the New York City-area facilities with respect to medical treatment and mental health care.  The most serious issues include ICE And facility medical staff denying individuals vital medical treatment, such as dialysis and blood transfusions; subjecting sick people in need of surgery to unconscionable delays; altering established treatments regimes; failing to consistently provide needed mental health services and needlessly placing people with mental health problems (and others) in solitary confinement; and ignoring repeated complaints and requests for care from people with serious symptoms, including severe pain.

*Id.* at ¶¶ 21, 23.  On COVID-19, Plaintiffs include a declaration from one Dr. Jaime Meyer, a professor at Yale Medical School with a focus on infectious diseases.  *See* Meyer Decl., ECF No. 42.  Meyer explains her view that the risk of COVID-19 is especially urgent for alien detainees:

> The risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected. …

Globally, outbreaks of contagious diseases are all too common in closed detention settings and are more common than in the community at large.  Prisons and jails are not isolated from communities.  Staff, visitors, contractors, and vendors pass between communities and facilities and can bring infectious diseases into facilities.  Moreover, rapid turnover of jail and prison populations means that people often cycle between facilities and communities.  People often need to be transported to and from facilities to attend court and move between facilities.  Prison health is public health. …

Based on my … experience working on public health in jails and prisons, and my review of the relevant literature, it is my professional judgment that these facilities are dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak, which would result in severe harm to detained individuals, jail and prison staff, and the broader community. …

The horizon of risk for COVID-19 in these facilities is a matter of days, not weeks.

*Id*. at ¶¶ 7-8, 26, 40; *see id.* at ¶¶ 27-35 (explaining that the risk of COVID-19 is more intense in ICE facilities because, among other things, "delays in access to care that already exist in normal circumstances will only become worse during an outbreak"; failure to provide "continuation of treatment" vis-à-vis what detainees received in the community "will result in increased risk of morbidity and mortality"; failure to provide adequate treatment of underlying conditions will increase the risk of COVID-19 infection and spread; and mental health conditions may be exacerbated by COVID-19 due to "isolation and lack of visitation").

   *2. The No-Release Policy*

        Second, Plaintiffs' preliminary injunction papers adduce the declaration of one David Hausman, a Ph.D. candidate in Political Science at Stanford University.  *See* Hausman Decl., ECF No. 12.  Hausman, analyzing data obtained in a separate action brought under the Freedom of Information Act, *see New York Civil Liberties Union v. ICE*, 18-cv-11557, opines that the No-Release Policy alleged by Plaintiffs is quantifiable via the numbers:

The dataset shows a substantial increase in detention rates for final decisions in the New York Field Office beginning in 2017.  In the period from the beginning of the data (January 2013) until June 5, 2017, 2,227 of 13,532 cases (approximately 16%) in fact resulted in a release decision, and an additional 1,719 (approximately 13%) had a bond set.  In the period from June 6, 2017 to September 2019, 109 of 6,788 (under 2%) were released, and 4 of 6,901 (under one-tenth of 1%) had a bond set.

Among individuals who posed a low flight risk and low danger (according to the [risk-assessment tool]), in the period from the beginning of the data until June 5, 2017, 348 of 874 cases (approximately 40%) were ordered released, and an additional 61 (approximately 7%) had a bond set.  In the period from June 6, 2017 to September 2019, 9 of 322 (approximately 3%) were released on community supervision and 3 of 322 (approximately 1% had a bond set).

In other words, among individuals who posed a low flight risk and low danger (according to the [risk-assessment tool]), in the period from the beginning of the data until June 5, 2017, 465 of 874 cases (approximately 53%) resulted in decisions to detain without bond, whereas from June 6, 2017 to the end of the spreadsheet, 310 of 322 (more than 96%) resulted in decisions to detain without bond.

*Id*. at ¶¶ 10-12.  Hausman's declaration also asserts that the data supports Plaintiffs' claims as to the 2015 and 2017 modifications to the risk-assessment tool.  *See id*. at ¶ 8 ("[It] appears that the [tool] was modified to remove the tool's ability to recommend bond be set ([around] 2015) and its ability to recommend release ([around] 2017).").

## C. Defendants' Opposition to Plaintiffs' Motion

As discussed at length *infra*, Defendants' opposition papers make a single core argument upon which most of its other contentions rely:  The No-Release Policy does not exist.  To substantiate this position, Defendants introduce into the record a declaration from Deputy Field Director in the New York City Field Office of Enforcement and Removal Operations for ICE, William P. Joyce.  *See* Joyce Decl., ECF No. 56.  Joyce states that ICE's New York office

has no policy of categorically denying release to all aliens subject to non-mandatory detention pursuant to INA § 236(a), 8 U.S.C. § 1226(a).  *Contrary to the allegations of the plaintiffs in this case, [we] do[] not have a "No-Release Policy."*  The majority of arrests that [we] make[] are predicated on some form of encounter by an alien with criminal law enforcement.  For example, for fiscal year 2019, 2,108 out of a total of 2,477 arrests made by [us] involved aliens with a conviction or pending charges in a criminal matter.  Of the remaining cases, a certain percentage … will be aliens with unexecuted final removal orders and aliens who may not have a criminal history, as well as aliens who have already been removed at least once and are subject to having their order reinstated.  Additionally, there has been a rise in the nationwide trend of aliens who have been released from ICE detention during the pendency of their removal proceedings of failing to appear for their hearings.  In light of the foregoing, the result … has been a denial of discretionary release for most of the aliens arrested after an individualized custody review.  *[We] ha[ve] been considering and continue[] to consider individual circumstances when making custody determinations* but exercise[] favorable discretion in cases where the alien demonstrates to the satisfaction of the immigration officer, at the time of the custody determination, that he or she is not a danger to the community or a flight risk.

*Id.* at ¶ 13 (emphases added).

    Joyce's declaration also makes several factual assertions as to the named Plaintiffs.  On

Mr. Velesaca, Joyce states:

    [Velesaca] unlawfully entered the United States at an unknown date and at an unknown place.  The New York State Police arrested Velesaca on June 19, 2016 and charged him with driving while intoxicated ("DWI") and aggravated DWI.  On November 10, 2016, he pleaded guilty to aggravated DWI and the same day he was sentenced to a conditional discharge, a $1,000 fine, and revocation of his driver's license.  On May 26, 2019, Putnam County Sheriff's Office arrested Velesaca and charged him with DWI, operating a motor vehicle with .08 of 1% alcohol or more in the blood, aggravated unlicensed operation of a motor vehicle in the third degree, and three motor vehicle infractions.  On January 22, 2020, Velesaca pleaded guilty to DWI … [and] [t]he same day he was sentenced to 5 years' probation, 240 hours of community service, and a $1,195 fine.  On January 30, 2020, ICE arrested Velesaca pursuant to a warrant of arrest and detained him for the purpose of placing him into removal proceedings.  That same day, ICE served Velesaca with an NTA [(Notice to Appear)] charging him as removable … and a Notice of Custody Determination, which informed him that his detention was governed by 8 U.S.C. § 1226(a), and that ICE had determined that it would not set bond for his release.  The custody notice also informed Velesaca that he

could seek review of this decision (a bond redetermination) before an Immigration Judge. …

Since his proceedings were commenced, Velesaca has had two master calendar hearings in connection with removal proceedings before an Immigration Judge, where he was represented by counsel at both hearings.  On March 4, 2020, Velesaca, represented by counsel, had a bond hearing before an Immigration Judge.  The Immigration Judge reviewed the evidence and heard argument from Velesaca's counsel and ICE regarding whether Velesaca should be released on bond.  Based on Velesaca's history with DWIs, the Immigration Judge denied Velesaca's request for release.  At this time, there is no indication that Velesaca has filed an appeal of that bond decision with the Board of Immigration Appeals ("BIA").  On March 23, 2020, another master calendar hearing was held in Velesaca's case.  Velesaca's counsel was present and waived Velesaca's presence for that hearing.  Counsel for Velesaca indicated that Velesaca wished to request voluntary departure from the United States, a limited form of relief from removal.  The Immigration Judge continued the case to a hearing to be held on April 6, 2020, for Velesaca to submit documentation to support that request.  His removal proceedings remain pending.

*Id.* at ¶ 15.  And as to Mr. Uzategui, Joyce states:

[Uzategui] was admitted to the United States at Fort Lauderdale, Florida on September 27, 2017 as a nonimmigrant visitor with permission to remain in the United States for a period of six months (*i.e.*, until March 2018).  He remained in the United States beyond that period without authorization.  On February 3, 2020, the Newburgh Town Police Department arrested Uzategui [] and charged him with petit larceny.  The status of the criminal proceedings against [him] us unknown to me at this time.  On February 18, 2020, ICE arrested Uzategui [] pursuant to a warrant of arrest and detained him for purpose of placing him into removal proceedings.  That same day, ICE served [him] with an NTA charging him as removable … and a Notice of Custody Determination, which informed him that his detention was governed by 8 U.S.C. § 1226(a), and that ICE had determined that it would not set bond for his release.  The custody notice also informed Uzategui [] that he could seek review of this decision … before an Immigration Judge. …  Since his proceedings were commenced, Uzategui [] has had one master calendar hearing in connection with his removal proceedings before an Immigration Judge, which was held on March 3, 2020.  He has not had a bond hearing yet, though it appears he filed a request for one on or about March 23, 2020.  His next master calendar hearing is scheduled for April 9, 2020.

*Id*. at ¶ 16.  Defendants also submitted a declaration from a member of ICE's "Health Service Corps," but this declaration did not address the existence of the No-Release Policy.  *See* Moon Decl., ECF No. 57.

D. Procedural History

Plaintiffs commenced this action on February 28, 2020.  *See* ECF No. 1.  That same day, Plaintiffs filed a motion for class certification.  *See* ECF Nos. 9, 10.  The matter was assigned to me shortly thereafter.  On March 16, 2020, Plaintiffs filed their operative amended Complaint, *see* ECF No. 31, and simultaneously filed an amended motion for class certification, *see* ECF Nos. 32, 33.  Also on March 16, Plaintiffs filed the instant motion seeking a preliminary injunction.  *See* ECF Nos. 40, 41.  I set an expedited briefing schedule to allow for oral argument on March 31, *see* ECF Nos. 51, 54, and the matter was fully briefed as of March 26, 2020.

On March 31, oral argument was held telephonically.  After hearing argument from both parties, I ruled extemporaneously, granting Plaintiffs' motion.  The following day, I issued a summary order with the exact terms of the injunctive relief awarded.  *See* ECF No. 67.

**Discussion**

Plaintiffs contend that Defendants have adopted an unannounced policy of detaining "virtually everyone" they arrest——including those who (a) do not pose a risk of flight or a danger to the community, or (b) have disabilities——and that the No-Release Policy violates the APA, the *Accardi* doctrine, and the Rehabilitation Act, in so doing irreparably harming the detainees by separating them from their families, exacerbating preexisting health conditions, exposing them to acute health risks (most notably, COVID-19), and limiting their abilities to

prepare bond applications.  Defendants counter principally that Plaintiffs' case is "fundamentally flawed" because the No-Release Policy does not exist.  Defendants secondarily add that review is unavailable under the APA because Plaintiffs have not exhausted administrative remedies and because Plaintiffs do not challenge "final agency action"; and that, in any case, the INA restricts the ability of the Court to grant injunctive relief on a classwide basis.

## A. Legal Principles

### 1. Preliminary Injunction Standard

A party "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A "preliminary injunction is an extraordinary remedy never awarded as of right." *Id*. at 24.[4]

Consistent with the basic principle that preliminary injunctions aim to keep matters as they are rather than shift things to the way one party would like them to be, *see, e.g., Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966) ("It is hornbook law that the general purpose of a preliminary injunction is to preserve the status quo…") (quotation marks omitted), a party seeking to alter the status quo in the form of a so-called "mandatory injunction" must make a heightened showing to obtain relief, *see, e.g., N. Am. Soccer League, LLC v. United States Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018) ("Because mandatory injunctions disrupt the

---

[4] While Plaintiffs' motion for class certification remains pending, as a general matter, courts "may conditionally certify the class or otherwise award a broad preliminary injunction, without a formal class ruling, under its general equity powers," *Strouchler v. Shah*, 891 F.Supp.2d 504, 517 (S.D.N.Y. 2012) (quotation marks omitted); *accord Vazquez Perez v. Decker*, No. 18-cv-10683, 2019 WL 4784950, at *4 (S.D.N.Y. Sept. 30, 2019).

status quo, a party seeking one must meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits.") (quotation marks omitted).[5]

    *2. The INA*

    Section 236 of the INA provides in relevant part as follows:

(a) <u>Arrest, Detention, and Release</u>.  On a warrant issued by the Attorney General, *an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States*.  Except as provided in subsection (c) and pending such decision, *the Attorney General*——

    (1) *may continue to detain the arrested alien*; and

    (2) *may release the alien* on——

        (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

        (B) conditional parole …

8 U.S.C. § 1226(a) (emphases added).  The Supreme Court has interpreted similar "may" language in other provisions of the INA to require the Attorney General to make "some level of individualized determination."  *I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 (1991) (interpreting 8 U.S.C. § 1252); *but see Reno v. Flores*, 507 U.S. 292, 313 (1993) (the requirement of an "individualized determination" in some contexts "does not mean that [INS] must forswear use of reasonable presumptions and generic rules").

    Regulation 8 C.F.R. § 1236.1, promulgated under the INA, adds this gloss:

*Any officer authorized to issue a warrant of arrest may*, *in the officer's discretion*, *release an alien* not described in [8 U.S.C. § 1236(c)(1)] of the Act, under the conditions at section [8 U.S.C. § 1236(a)(2) and (3)]; *provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a*

---

[5] Plaintiffs urge in a footnote that they need only show, as an alternative to likelihood of success on the merits, a "serious question going to the merits," *see* Pl. PI Mem. at 18 n.6, but this is incorrect.  As Defendants point out, the Second Circuit has held that this standard is inappropriate when, as here, the challenge is made with respect to government action taken pursuant to a statutory or regulatory scheme.  *See Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019) ("[W]e have repeatedly stated that the serious-questions standard cannot be used to preliminarily enjoin governmental action.").  Plaintiffs do not press this point in their reply brief.

> *danger to property or persons, and that the alien is likely to appear for any future*
> *proceeding.*

8 C.F.R. § 1236.1(c)(8) (emphases added).

Aliens may petition for review of an initial custody determination before an IJ, *see* 8 C.F.R. § 1236.1(d)(1); 8 C.F.R. § 1003.19(a), at which time the IJ may base its decision "upon any information that is available to the [IJ] or that is presented to him or her by the alien or the [government]," 8 C.F.R. § 1003.19(d); *In re Guerra*, 24 I. & N. Dec. 37, 39 (BIA 2006) ("[T]he Act does not limit the discretionary factors that may be considered by the Attorney General in determining whether to detain an alien …").[6]  An alien unsatisfied with the IJ's decision may appeal to the Board of Immigration Appeals ("BIA") for *de novo* review.  *See* 8 C.F.R. § 1236.1(d)(3)(i); 8 C.F.R. § 1003.1(d)(3)(ii) ("The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of [IJs] de novo.").

The Supreme Court has long "recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process."  *Demore v. Kim*, 538 U.S. 510, 523 (2003); *see id*. ("deportation proceedings would be in vain if those accused could not be held in custody pending the inquiry into their true character") (quotation marks omitted). And the Court has interpreted Section 1226(a) to give DHS "discretion either to detain the alien or release him on bond or parole."  *Nielsen v. Preap*, 139 S. Ct. 954, 959 (2019).

3. *The* Accardi *Doctrine*

Pursuant to "deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations."

---

[6] A custody determination by ICE made as a matter of discretion is not judicially reviewable.  *See* 8 U.S.C. § 1226(e) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review.  No court may set aside any action or decision by the Attorney General under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole.").

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, --- F.3d ---, 2020 WL 1320886, at *8 (2d Cir. Mar. 20, 2020). And "[w]hen agencies fail to do so, the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *Id*. This cause of action "is sometimes called 'the *Accardi* principle," after the decision cited most frequently for it, *United States ex rel. Accardi v. Shaughnessy*, [347 U.S. 260 (1954)]. … The [Supreme] Court has variously suggested that it is inherent in the nature of delegated 'legislative power'; that it is required by due process; and that it is a principle of administrative common law." Thomas W. Merrill, *The Accardi Principle*, 74 Geo. Wash. L. Rev. 569, 569 (2006); *see also, e.g., Montilla v. INS*, 926 F.2d 162, 166 (2d Cir. 1991) ("The seeds of the *Accardi* doctrine are found in the long-settled principle that rules promulgated by a federal agency, which regulate the rights and interests of others, are controlling upon the agency."); *id*. at 167 ("The *Accardi* doctrine is premised on fundamental notions of fair play underlying the concept of due process.").

The *Accardi* principle applies "even where the internal procedures are possibly more rigorous than otherwise would be required" by statute or by the Constitution. *Montilla*, 926 F.2d at 167 (quotation marks omitted). While courts have expressed reluctance to "review the merits of decisions made within the area of discretion delegated to administrative agencies," they have "insisted that where the agencies have laid down their own procedures and regulations, those procedures and regulations cannot be ignored by the agencies themselves even where discretionary decisions are involved." *Smith v. Resor*, 406 F.2d 14, 145 (2d Cir. 1969).

### 4. The APA

#### i. Arbitrary and Capricious Agency Action

A court reviewing agency action shall set aside such action "found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A).  Consistent with this requirement that agency action be neither arbitrary nor

capricious, it is a "longstanding principle of administrative law that '[a]n administrative agency

has a duty to explain its ultimate action.'"  *Nat. Res. Def. Council v. Dep't of Interior*, 410

F.Supp.3d 582, 596 (S.D.N.Y. 2019) (quoting *Cablevision Sys. Corp. v. F.C.C.*, 570 F.3d 83, 92

(2d Cir. 2009)).  This requirement, "that an agency provide reasoned explanation for its action,"

would "ordinarily demand that [the agency] display awareness that it *is* changing position.  An

agency may not, for example, depart from a prior policy *sub silentio*."  *F.C.C. v. Fox Television*

*Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct.

2117, 2125 (2016) ("Agencies are free to change their existing policies as long as they provide a

reasoned explanation for the change.").  The explanation requirement "is not limited to formal

rules or official policies and applies equally to practices implied from agency conduct."  *Saget v.*

*Trump*, 375 F.supp.3d 280, 355 (E.D.N.Y. 2019).[7]

      ii. Notice and Comment

      The APA, *see* 5 U.S.C. § 553, "requires agencies to provide notice and an

opportunity for public comment before a rule is promulgated."  *Time Warner Cable Inc. v.*

---

[7] Thus, a number of cases have involved courts inferring from a course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing.  *See, e.g., Elec. Privacy Info Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011) (in rejecting argument that agency had simply issued a general statement of policy, reasoning that "our cases make clear that an agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding") (quotation marks omitted); *U.S. Tel. Ass'n v. F.C.C.*, 28 F.3d 1232, 1234 (D.C. Cir. 1994) ("Although sometimes we face the difficulty of reviewing a statement before it has been applied and therefore are unsure whether the agency intends to be bound, that is not so in this case.  The schedule of fines has been employed in over 300 cases and only in 8 does the Commission even claim that it departed from the schedule."); *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1319 (D.C. Cir. 1988) (same for 4 exceptions out of 100 cases); *Damus v. Nielsen*, 313 F.Supp.3d 317, 339-42 (D.D.C. 2018) (finding the numbers "irrefutable" where during one eight-month stretch two ICE offices denied parole applications in 100% of cases, another two ICE offices denied applications in 92% and 98% of cases respectively, and the evidence showed that previously ice "*granted* parole to more than 90% of asylum-seekers"); *cf. also Amadei v. Nielsen*, 348 F.Supp.3d 145, 165 (E.D.N.Y. 2018) ("[N]umerous courts have found that a plaintiff can satisfy the [APA's] finality requirement without offering evidence of a formal or official statement regarding the agency's position.").

*F.C.C.*, 729 F.3d 137, 167 (2d Cir. 2013).  "[N]otice-and comment requirements apply only to"
so-called substantive rules, that is, rules that "create new law, rights, or duties, in what amounts
to a legislative act."  *Id*. at 168 (quotation marks omitted); *see id.* (the mark of a "substantive"
rule "might well be characterized" as "whether the substantive effect is sufficiently grave so that
notice and comment are needed") (quotation marks omitted).

iii. Final Agency Action

The APA limits judicial review of agency decisions to review of "final agency
action."  5 U.S.C. § 704.  The Supreme Court has held that "two conditions must be satisfied for
agency action to be final:  First, the action must mark the consummation of the agency's
decisionmaking process … —it must not be of a merely tentative or interlocutory nature.  And
second, the action must be one by which rights or obligations have been determined, or from
which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation
marks omitted).  "Agency action" is defined in the APA as inclusive of "the whole or a part of an
agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."
5 U.S.C. § 551(13).  This definition has in turn been understood to require discreteness, *see*
*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004), and, inversely, understood not to
"extend to reviewing generalized complaints about agency behavior," *Cobell v. Kempthorne*, 455
F.3d 301, 307 (D.C. Cir. 2006).

*5. The Rehabilitation Act*

Section 504 of the Rehabilitation Act, *see* 29 U.S.C. 794(a), "prohibits programs
and activities receiving federal financial assistance from excluding, denying benefits to, or
discriminating against otherwise qualified individuals with a disability."  *Disabled in Action v.*
*Bd. of Elections in City of New York*, 752 F.3d 189, 196 (2d Cir. 2014) (quotation marks

18

omitted).  To establish a Section 504 violation, "a plaintiff must demonstrate that (1) he is a

qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he

was denied the opportunity to participate in or benefit from the defendant's services, programs,

or activities, or was otherwise discriminated against by the defendant because of his disability."

*Id.* at 196-97 (quotation marks omitted).  Public entities must "make reasonable modifications in

policies, practices, or procedures when the modifications are necessary to avoid discrimination

on the basis of disability…"  *Hargrave v. Vermont*, 340 F.3d 27, 37 (2d Cir. 2003).

Federal regulation provides that the term "disability" extends to, among other

things, "[a]ny physiological disorder or condition," "[m]ajor depressive disorder," and "post-

traumatic stress disorder."  28 C.F.R. § 35.108.  DHS regulations further provide that:

> No qualified individual with a disability in the United States, shall, by reason of
> his or her disability, be excluded from the participation in, be denied benefits of,
> or otherwise be subjected to discrimination under any program or activity
> conducted by the Department.

6 C.F.R. § 15.30(a); *see also id.* at § 15.30(b)(1) ("[DHS], in providing any aid,

benefit, or service, may not directly or through contractual, licensing, or other arrangements, on

the basis of disability … [p]rovide a qualified individual with a disability with an aid, benefit, or

service that is not as effective in affording equal opportunity to obtain the same result, to gain the

same benefit, or to reach the same level of achievement as that provided to others.").

*6. Limits on Injunctive Relief under the INA*

Section 242 of the INA limits the authority of courts to impose injunctive relief:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-
> 1231], other than with respect to the application of such provisions to an
> individual alien against whom proceedings under such part have been initiated.

19

8 U.S.C. § 1252(f)(1).  Examining this language, the Supreme Court has observed that, "[b]y its

plain terms, … that provision is nothing more or less than a limit on injunctive relief.  It prohibits

federal courts from granting classwide injunctive relief against the operation of [§§ 1221-1232],

but specifies that this ban does not extend to individual cases."  *Reno v. American-Arab Anti-*

*Discrimination Comm.*, 525 U.S. 471, 481-82 (1999).  More recently, Judge Alison Nathan of

this District had occasion to interpret and apply Section 1252(f)(1), concluding that the provision

barred imposition of classwide injunctive relief that "would enjoin or restrain the manner" of the

INA's operation——in that case by mandating certain behavior upon which the INA is "silent."

*Vazquez Perez v. Decker*, 18-cv-10683, 2019 WL 4784950, at *6 (S.D.N.Y. Sept. 30, 2019).


B. <u>Application</u>

        Despite the long wind-up that it has taken to make it this far, this dispute

ultimately turns on a relatively narrow factual question:  Does the No-Release Policy exist or

not?  Plaintiffs claim that it does; Defendants retort that it does not.  Notably, Defendants do not

argue that a policy of the kind described by Plaintiffs would be permissible under the INA.  To

the contrary, Defendants affirm——again and again——that ICE is exercising discretion in making

custody determinations.  *See, e.g.,* Def. PI Opp. Mem., ECF No. 55, at 22 ("What exists is a

system by which ICE considers each alien for release…"), 23 ("[T]he record reflects that an ICE

supervisory officer makes the final discretionary determination after using a computerized risk

assessment tool …"), 25 (arguing that "decision-making" authority is left "squarely in the hands

of ICE personnel," which is "the hallmark of a discretionary, individualized decision").  The

centrality of this factual issue cannot be overstated.  If the No-Release Policy does *not* exist, as

Defendants contend, then Plaintiffs' challenges largely evaporate.  For example, if ICE officers

are in fact making individualized custody findings, then there is no need for the Court to impose an order requiring ICE officers to make such findings; if ICE is not denying release on bond as a matter of general policy, then there has been no *sub silentio* shift in policy in contravention of the APA.  And so on.  For the reasons below, and as I explained in my ruling at oral argument, I find that, on the current record, Plaintiffs have established a clear and substantial likelihood of being able to demonstrate that the No-Release Policy exists, breathing life into their claims, both under the APA and *Accardi* doctrine, and that none of the procedural hurdles identified by Defendants preclude my awarding injunctive relief in Plaintiffs' favor.

Preliminarily, although the language of Plaintiffs' request for relief injects some semantic ambiguity, *see* Pl. PI Mot. at 38 (requesting a Court order "requiring the government to *promptly provide* the petitioners with an individualized determination") (emphasis added), at its core, Plaintiffs' plea for injunctive relief seeks a traditional injunction, rather than a so-called "mandatory" injunction.  I come to this conclusion for a few reasons.  First, the relief available under the APA is for courts to "set aside" agency action, rather than to require the agency to embark on some new course of action.  *New York v. Dep't of Commerce*, 351 F.Supp.3d 502, 671 (S.D.N.Y.) ("By the statute's plain terms … the normal remedy in a successful APA challenge is to set aside——that is, vacate——the final agency action at issue.") (quotation marks omitted), *aff'd in part*, *rev'd in part on other grounds*, 139 S. Ct. 2551 (2019); *see also* 5 U.S.C. § 706.  Second, any relief that went beyond requiring the agency to follow the law, would run afoul of the INA's restriction on classwide injunctive relief.  *See* 8 U.S.C. § 1252(f)(1).  And as a matter of logic:  while an injunction forbidding Defendants from acting upon any "No-Release Policy" may very well cause the government to affirmatively change its behavior, this change is in essence an injunction *against an aberration* from ICE policy (and the APA), rather than an

21

injunction mandating some new form of court-conjured behavior.[8]  Plaintiffs therefore need only

show a likelihood of success on the merits, rather than a "clear or substantial" likelihood of

success——although for the reasons that follow, Plaintiffs could meet either burden.

The requirements that Plaintiffs show irreparable harm and that a balance of the

equities favors granting their motion are both easily met here.  Plaintiffs assert that their injuries

are "imminent and certain" because Defendants have "implemented the No-Release Policy" and

Plaintiffs are, as a result, exposed to "serious medical risks——increasing daily with the spread of

COVID-19——and harms [to] their families, as well as [] ongoing violation of constitutional

rights."  Pl. PI Mem. at 17.[9]  Plaintiffs urge that COVID-19 makes their unnecessary detention

"particularly dangerous," as the virus is highly contagious and correctional facilities are "ticking

time bombs" given the crowding, weakened immune systems of inmates, and the like.  *Id.* at 14.

In response, Defendants principally argue that Plaintiffs cannot show irreparable harm because

they complain of issues with detention "that may be experienced by anyone in detention," and, in

any event, Plaintiffs can "seek reconsideration of ICE's initial custody determinations" before an

IJ.[10]  Def. PI Opp. Mem. at 33-36.

---

[8] *Cf. Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) ("The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics. Determining whether the status quo is to be maintained or upset has led to distinctions that are more semantic than substantive. … An injunction that prohibits a party from refusing to permit some act may, as a practical matter, alter the status quo.") (quotation marks and alterations omitted).

[9] Specifically, Plaintiffs contend that detention (1) prevents detainees from meaningfully preparing for their immigration cases, Pl. PI Mem. at 9; (2) cuts off families from detainee's earnings, *see id.*; (3) exposes detainees to "grossly inadequate" healthcare, which includes a track record of New York City area facilities "denying people access to vital medical and mental health treatment," *id.* at 10 (citing, *inter alia*, a report by "Human Rights First," which concluded that ("[m]any detained people report substandard or denial of medical care, long waits to be seen by a medical professional, and a lack of proper medication," ECF No. 14-14, at 1); and (4) risks worsening detainees' mental health, *see id.* at 10-11. Plaintiffs also adduce evidence with respect to named Plaintiffs' Velesaca and Uzategui facing danger from COVID-19 and continued detention.  *See, e.g.*, ECF Nos. 35, 36.

[10] The APA provides that actions for which there exists some "other adequate remedy" are not reviewable.  5 U.S.C. § 704.  This exception has been read narrowly.  *See, e.g., R.I.L-R*, 80 F.Supp.3d at 185 ("The Supreme Court has long

Defendants miss the mark.  For one thing, "[s]everal courts in this circuit have," quite properly I would add, "concluded that the deprivation of an alien's liberty is, in and of itself, irreparable harm."  *Sajous v. Decker*, 18-cv-2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2013) (quotation marks and alterations omitted); *see id.* (collecting cases); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (a properly alleged violation of a constitutional right triggers a presumption of irreparable harm).  For another, the fact that Plaintiffs may seek review by an IJ of their initial bond determination does nothing to mitigate the harm to Plaintiffs in the time they are in detention awaiting review, *see, e.g., R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 185 (D.D.C. 2015) ("While it is true that an alien who is denied release by ICE may seek *de novo* review of that denial from an immigration judge, ... this potential redetermination ignores the fact that it occurs weeks or months after ICE's initial denial of relief.  It thus offers no adequate remedy for the period of unlawful detention members of the class suffer *before* receiving this review—the central injury at issue in this case.").  What's more, Plaintiffs here are not challenging determinations by IJs after detention *per se*; they are challenging a policy that constrains *initial* custody determinations, making it rather doubtful that later review by an IJ would provide meaningful relief.  And as to the balance of the equities, Plaintiffs contend that ICE has acted in derogation of the APA and its own regulations, and there can be no doubt that the public interest favors requiring the government to comply with the law.  *See, e.g., L.V.M. v. Lloyd*, 318 F.Supp.3d 601, 620 (S.D.N.Y. 2018) ("[T]his Court is hard-pressed to see how setting aside an unlawful practice could be against the public interest.").

---

construed the 'adequate remedy' limitation on APA review narrowly, emphasizing that it 'should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action.'") (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).

Next, the key question:  Has ICE indeed adopted the No-Release Policy?  As noted *supra,* Plaintiffs argue, and Defendants do not dispute, that 8 U.S.C. § 1226(a) and its implementing regulations require ICE officials to make an individualized custody determination. *See* Pl. PI Mem. at 20-22.  Plaintiffs argue that the data analyzed and reviewed in the Hausman Declaration show that ICE has been applying a No-Release Policy.  For instance, as quoted above, the Declaration states:

> The dataset shows a substantial increase in detention rates for final decisions in the New York Field Office beginning in 2017.  In the period from the beginning of the data (January 2013) until June 5, 2017, 2,227 of 13,532 cases (approximately 16%) in fact resulted in a release decision, and an additional 1,719 (approximately 13%) had a bond set.  In the period from June 6, 2017 to September 2019, 109 of 6,788 (under 2%) were released, and 4 of 6,901 (under one-tenth of 1% had a bond set.)

Hausman Decl. at ¶ 10.  Plaintiffs argue that the numbers speak for themselves and I agree.  One need not fix the precise point between 2015 and 2017 that a change took place to see plainly that a change, of considerable magnitude, took place.  Per the data, ICE went from releasing (on bond or recognizance) upwards of 30% of alien arrestees to releasing around 2%.  The percentage of arrestees released in 2013 and 2014 was around 40%; in 2018 and 2019, between 1% and 2%. The comparisons are striking.

Defendants make several attempts to impeach the data.  None is persuasive.  First, Defendants point out that the numbers suggest that the risk-assessment tool has, over time, increasingly made a recommendation that an ICE supervisor make the final call on custody.  *See* Def. PI Opp. Mem. at 23-24.  But even if the risk-assessment tool increasingly passed along such decisions to ICE supervisors, this would not change that (a) the tool seems to have been modified to recommend bail and release in fewer instances, and (b) around 2017, the percentage of aliens detained without bond steeply increased.  Second, Defendants make the related argument that the

data show an uptick in the number of times in which ICE has deviated from the risk-assessment

tool's recommendation.  *See id*. at 26-27.  But again, this does nothing to explain why the denials

of release skyrocketed.  Third, Defendants argue that the incidence of denials focuses only on the

end result, rather than the input-variables, *e.g.,* the fact that in 2019, "2,108 out of a total of 2,477

arrests made by [ICE] New York involved aliens with a conviction or pending charges in a

criminal matter," *id*. at 13, or the fact that "there has been a rise in the nationwide[11] trend of

aliens who have been released from ICE detention during the pendency of their removal

proceedings of failing to appear for their hearings," *id*. at 14.  Assuming *arguendo* the accuracy

of these numbers, and the implicit argument that criminal activity of any kind is a fair proxy for

risk of flight or danger to the community, Defendants' contention still fails because it does not

allege that these numbers changed markedly in or around 2017, such that an abrupt shift could be

explained.  For example, Defendants do not argue that in 2013, only few aliens arrested by ICE

had a conviction or pending criminal charges, while after 2017, suddenly, many aliens were thus

situated.  To the contrary, the data in the record shows an *increase,* not a *decrease,* in the number

of ICE arrests of persons with *no* criminal background.  *See* ICE Enforcement in New York City,

ECF No. 14-6, at 2.

Fourth and finally, Defendants rely heavily on the Joyce Declaration, in which

Mr. Joyce denies that the No-Release Policy exists:

> [S]ignificantly, ICE has affirmed that no such policy exists.  Joyce Decl. ¶ 13.
> ICE has affirmed that it conducts individualized custody determinations for each
> alien detained under § 1226(a), and that the agency considers flight risk and
> dangerousness in making such determinations, in accordance with its regulations.

---

[11] I note that because, among other reasons, Defendants reference only a "nationwide" trend, the reference has limited
use for the present lawsuit, targeted only at a select few New York City-area ICE facilities.

Def. PI Opp. Mem. at 33; *see also* Joyce Decl. ¶ 13 (ICE "has no policy of categorically denying

release to all aliens" held pursuant to Section 1226(a)).

      The Court is aware of the deference owed to agency decisionmaking and to the

technical expertise that agencies wield in their resolution of complex and highly specialized

subject matter.  But the agency cannot credibly dispute that which its own data strongly shows

and that is that a No-Release Policy substantially has been put into effect.

      I find that Plaintiffs have demonstrated, at this stage, that they are likely to

succeed in proving the existence of the No-Release Policy.  As Defendants acknowledge, a No-

Release Policy is inconsistent with the INA and regulations passed thereunder, at least without

notice-and-comment rule making.  Plaintiffs have thus shown a likelihood of success on the

merits of their claims.  As the Court has already found that Plaintiffs have shown they will suffer

irreparable harm without relief and that the equities tilt in Plaintiffs' favor, injunctive relief is

called for here.

*****

      Defendants' additional objections are without merit, as is Plaintiffs' contention

under the Rehabilitation Act.

      First, Defendants argue that Plaintiffs fail to challenge "final agency action" and

that Plaintiffs have other "adequate remed[ies]" available to them, precluding judicial review

under the APA, *see* 5 U.S.C. § 704.  *See* Def. PI Opp. Mem. at 28.  Defendants argue that

Plaintiffs point to no "regulation, letter, memorandum, or other form of written material the

comprises this policy that they allege is being applied," and that Plaintiffs can challenge their

custody determinations before an IJ and ultimately the BIA.  *See id*. at 29-31.  But finality can be

gleaned from agency action and the effects thereof and does not require any written evidence, *see*

26

*supra* note 7, and, as indicated already, Plaintiffs' challenge is best viewed as one against the

No-Release Policy writ large, rather than their individual custody findings, and as such it is

improbable that Plaintiffs can receive an adequate remedy by appealing to an IJ or the BIA.

Second, Defendants argue that *Accardi* is inapplicable here because the No-

Release Policy does not exist.  *See* Def. PI Opp. Mem. at 33.  Having found that the policy does

exist, Defendants are out of luck on this front.

Third, Defendants argue that 8 U.S.C. § 1252(f)(1) prevents the Court from

imposing a classwide injunction that does anything beyond requiring ICE to follow the law.  *See*

*id.* at 40.  Following the law, however, is precisely what the Court has ordered, *see* ECF No. 67.

Finally, Plaintiffs ask that, as part of the injunctive relief imposed, that the Court

require ICE officials to consider Plaintiffs' "disability" when making custody rulings.  *See* Pl. PI

Mem. at 38.  But, unlike their claims regarding the No-Release Policy, Plaintiffs put forth no

data supporting their claim that ICE is neglecting to account for the disabilities of aliens that are

arrested, and no law or regulation that requires a certain weight be given to disability.  *See, e.g.,*

8 C.F.R. § 1236.1(c)(8) (requiring only that an alien seeking release must demonstrate to the ICE

officer that the alien is neither a "danger to property or persons" nor a flight risk).  On top of that,

Defendants represent that they *do* take disability into account, but that "[w]hile an alien's

disability may impact a custody determination, ultimately, the question of whether an alien is to

be detained pending removal proceedings is guided by whether the alien demonstrates to the

satisfaction of the officer that he or she is not a danger to the community or a flight risk."  Joyce

Decl. at ¶ 12.  The Court lacks evidence that ICE is in fact disregarding disability in its custody

determinations, and further cannot find any statutory support that would justify ordering ICE to

27

give a particular weight to disability vis-à-vis the other factors ICE considers.  As such, I do not

order any relief on the Rehabilitation Act claim at this time.

### Conclusion

For all the foregoing reasons, and all the reasons stated on the record at oral

argument, Plaintiffs' motion for injunctive relief is granted as follows:

> The Court grants preliminary injunctive relief, enjoining Defendant Thomas R.
> Decker in his official capacity as New York Field Office Director for U.S.
> Immigration and Customs Enforcement ("ICE"), and all successors appointed or
> acting, from using or applying practices or policies relating to the discretion of
> ICE officers to release to the community on recognizance or pursuant to bond,
> under Section 236 of the Immigration and Nationality Act, 8 U.S.C. § 1226(a),
> and all applicable implementing regulations, to any person now or hereafter
> arrested by Defendants or officers or agents directly or indirectly supervised by
> Defendants, in any manner more stringent or more onerous than those used or
> applied prior to June 6, 2017.

> This order shall not apply to any person so arrested who has had his bond or
> recognizance application heard by an immigration judge.[12]

> Defendants shall file a report on April 17, 2020, identifying, as of April 10, 2020,
> all persons thus arrested by or under the authority of ICE's New York Field
> Office and, of such persons, all such persons who have had their bond or
> recognizance application heard by an immigration judge.

ECF No. 67.  The government timely provided a report.  *See* ECF No. 70.

In the time between my oral ruling and the issuance of this written order, the

parties have notified the Court that they have had disagreements regarding implementation of the

---

[12] Both of the named petitioners in this case have already had hearings on bond before an IJ.  Nonetheless, as I
observed at oral argument, due to the recurrent nature of the issue here, the putative class action may continue.  *See,
e.g., Ortiz v. Ciox Health LLC*, No. 17 Civ. 4039, 2018 WL 1033237, at *3 (S.D.N.Y. Feb. 22, 2018) ("Under the
appropriate circumstances, class certification may relate back to the filing of the complaint, even if a named
plaintiff's claims for damages have been resolved.  Relation back most frequently applies where the claims are so
inherently transitory that the trial court will not have even enough time to rule on a motion for class certification
before the proposed representative's individual interest expires.") (alterations, citations, quotation marks omitted).

injunction.  *See* ECF Nos. 71, 72, 73.  These disagreements have culminated in the government's filing of a motion to clarify and/or amend the injunction.  *See* ECF No. 74.  The Court will issue a separate order, in due course, setting a briefing schedule and an argument date on that motion.


SO ORDERED.

Dated:      May 4, 2020                        _____/s/_____
            New York, New York                      ALVIN K. HELLERSTEIN
                                                     United States District Judge

29